## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JENNIFER ELLER,

      Plaintiff,

      v.

PRINCE GEORGE'S COUNTY
PUBLIC SCHOOLS,
PRINCE GEORGE'S COUNTY
BOARD OF EDUCATION and
MONICA GOLDSON, *in her official capacity*,

      Defendants.

Civil Action No. TDC-18-3649

## MEMORANDUM OPINION

Plaintiff Jennifer Eller has filed this civil action against the Prince George's County Public Schools ("PGCPS"), the Prince George's County Board of Education ("BOE"), and PGCPS Chief Executive Officer Monica Goldson, alleging that while working in various PGCPS schools in Prince George's County, Maryland, she was subjected to a hostile work environment, constructive discharge, and unlawful retaliation on the basis of sex, gender identity, and transgender status, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018); Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 (2018); the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-606 (West 2021); and the Prince George's County ordinance prohibiting employment discrimination, Prince George's County, Md. Code ("PGC Code") § 2-222 (Supp. 2021). She also alleges, pursuant to 42 U.S.C. § 1983, a claim that this conduct violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Pending before the Court are Defendants' Motion for Summary Judgment and Eller's Cross Motion for Partial Summary

Judgment, which are fully briefed.  Having reviewed the submitted materials, the Court finds that

no hearing is necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, the Motions

will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.      Eller's Employment

Jennifer Eller, a transgender woman who was assigned the sex of male at birth, was

employed as a teacher within the PGCPS from 2008 to 2017.  From 2008 to 2011, Eller worked

as a reading and English language arts teacher for gifted and talented students at Kenmoor Middle

School ("Kenmoor") in Landover, Maryland.  In May 2011, in light of alleged harassment of Eller

at Kenmoor, Eller and PGCPS agreed that she would be transferred to another school.  She was

then placed at Friendly High School ("Friendly") in Fort Washington, Maryland, at which she was

an English teacher from August 2011 to June 2016.  In June 2016, following additional alleged

harassment, Eller was transferred to a position as an English teacher at James Madison Middle

School ("James Madison") in Upper Marlboro, Maryland, at which she remained on staff from

August 2016 until her resignation on August 18, 2017.

### II.     Alleged Harassment

#### A.      Kenmoor Middle School

In the Spring of 2011, during the course of her employment at Kenmoor Middle School,

Eller informed Kenmoor Principal Maha Fadli that she would be socially transitioning to begin

living as a woman in accordance with her gender identity.  As part of this process, she began to

wear more feminine clothing to work.  From the time that Eller began transitioning until her

resignation from PGCPS, she was subjected to insults, threats, and physical assaults.  The

harassment included frequent misgendering—being referred to with names, pronouns, or terms associated with a different gender identity.

Although Eller asked Fadli to keep the fact of her transitioning private until she was ready to discuss it with others, Fadli announced it to the teachers on Eller's grade-level team without Eller's consent. After her transitioning became publicly known, students in her class at Kenmoor called Eller "fag," "gay," "homo," "tranny," and "booty warrior," a term referencing a character that was a pedophile or child molester. Joint Statement of Undisputed Facts ("JSUF") ¶ 20, ECF No. 115-1; Joint Record ("J.R.") 397-99, 428-30, ECF Nos. 105-108. The harassment included being physically grabbed or touched in the hallways. Eller was also frequently misgendered by Kenmoor teachers and students. Even though she had legally changed her name to Jennifer Eller, another Kenmoor teacher, Courtney Ball, repeatedly referred to Eller by her former name in front of co-workers at staff meetings, even when corrected by others. Ball also made derogatory comments about Eller's appearance and hormone replacement therapy.

As early as May 4, 2011, Eller complained to Fadli about the harassment and informed her that she had overheard PGCPS staff in the Kenmoor teacher's lounge saying ". . . thinks he's a girl. . . . I know. It's disgusting." JSUF ¶ 18. She emailed Fadli about the "booty warrior" statement on May 17, 2011. JSUF ¶ 20. On a third occasion in May 2011, Eller emailed Fadli asking for assistance in bringing the harassment to an end. Rather than address the harassment itself, however, Kenmoor administrators instead focused on obscuring signs of Eller's transition by getting her to agree to limit her clothing, footwear, and make-up to less feminine versions and to not wear nail polish. A human resources staff member demanded that she present as male and told her that a note from her therapist regarding her transition was "garbage." J.R. 399. On May 24, 2011, Eller and Fadli agreed that Eller should be transferred to another school.

3

### B.     Friendly High School

Eller's August 2011 transfer to Friendly High School did little to alleviate the frequency or severity of the harassment.  During her time at Friendly, Eller was harassed by staff, students, and parents alike.  Harassment by co-workers began shortly after her arrival, when Peter Quaeway, the head football coach at Friendly, told team members to "just stay away from it and leave it alone," in reference to Eller.  J.R. 700.  Assistant Principal Paula Robinson, who oversaw the English Department, of which Eller was a member, repeatedly misgendered her and continued to do so even after being corrected.  Other staff did the same.  During the 2011-2012 school year, mathematics teacher Brian Ecton told his Advanced Placement ("AP") class that Eller should have waited until she looked more like a woman before coming to teach at Friendly.  Other teachers asked her about her surgical status, called her a "he-she," and asked her "if it was worth all the disruption" just so she "could wear a skirt."  J.R. 81.

As early as August 2011, two students at Friendly began to harass Eller verbally, calling her "the he/she."  J.R. 401.  In December 2011, students asked about the appearance of her genitals, and on January 9, 2012, a student shouted "tranny" and "transvestite" as she attempted to teach her classes.  J.R. 401.  Eller was also assaulted in her own classroom during the 2011-2012 school year, when a student who had previously referred to her as a "tranny" shoved her out of an open doorway after she caught the student cheating on a test.  J.R. 81, 401.  The verbal harassment continued into the 2012-2013 school year, as parents also used a variety of derogatory terms such as "tranny" and pedophile to refer to Eller, J.R. 402, 404, and students at Friendly continued to use similar terms, regularly misgendered Eller, and made comments about her surgical status like "do you have a dick," "do you bleed," and "have you cut it off."  J.R. 402-03; J.R. 432.  That same school year, the derogatory insults escalated to threats of physical assault, when a student

4

approached Eller in the Friendly parking lot and told her that he and his friends planned to "rape" her and make her "their girlfriend." J.R. 402.

In the fall of the 2013-2014 school year, students shouted "tranny" at Eller from their classrooms, insinuated that she was a prostitute by asking "how much do you charge," and again made degrading remarks like "did you cut it off" in reference to her genitalia. J.R. 403. The threats also continued that school year when a different student confronted Eller in the hallway and whispered, "you best watch yourself" *Id.* In another incident that year, a student stepped on and pressed down on Eller's foot while using a slur about her transgender status.

In or about June 2015, a female student stopped in front of her door and waggled her crotch while addressing her as "Ho." JSUF ¶ 48. Between August 27, 2015 and November 16, 2015, students continued to misgender Eller and referred to her as a "guy in a dress," "shemale," "he/she," and "tranny." J.R. 406-407. On one occasion in October 2015, Eller confronted another English teacher, Ms. Claggett, about her refusal to use the correct pronouns for a student. The teacher refused to change her pronoun usage and accused Eller of attempting to force her to "push the transgender agenda." J.R. 406-07; J.R. 467-68. On November 10, 2015, while Eller was walking into school, a young man stepped onto her foot and pressed down until she cried out in pain, then called her "tranny" and walked away. J.R. 407.

At Friendly, Eller began reporting incidents of harassment to school administrators as early as August 30, 2011, when she sent an email detailing misgendering by students to Friendly Principal Raynah Adams. Over the course of her time at Friendly, Eller sent to school administrators at least 16 separate emails reporting harassment by co-workers, students, and parents. Eller also made repeated requests for additional student and staff training on gender identity discrimination to school administrators. Beginning in her first year at Friendly, Eller filed

multiple complaints on PGPCS Form PS-74, the form used by teachers to report student conduct that they believe to be discriminatory against them, including to report to the shoving incident during the 2011-2012 school year.

Eller did not consider the response to her complaints to be sufficient because the harassment did not abate, and her requests for diversity training were largely ignored. Both Adams and Friendly Assistant Principal Kevin Thompson coded Eller's complaints of student insults and epithets as mere "disrespect," rather than sexual harassment. *See, e.g.*, J.R. 441; J.R. 172-73. Adams actually discouraged Eller from filing a PS-74 in response to the shoving incident.

On February 20, 2015, shortly after she was misgendered by Robinson in front of other staff, Eller filed a Discrimination or Harassment Incident Report ("the Incident Report") with the PGCPS Equal Employment Opportunity ("EEO") Office requesting an apology from Robinson, transgender awareness sensitivity training for staff, and that Robinson no longer be her administrative supervisor. In March 2015, Friendly staff received a required training on LGBTQ issues given by Major Irene Burks of the Prince George's County Police Department, who was the Special Advisor to the Chief on LGBTQ concerns. That training, however, was cut short by Adams after a teacher interrupted Officer Burks and stated, "I don't know why we have to go through changes for someone else. They are just too sensitive." J.R. 411; J.R. 658-59; J.R. 690-93. On June 25, 2015, in response to the Incident Report, the PGCPS EEO Office issued a Letter of Determination recommending "professional counsel and/or discipline" for Robinson and "diversity and sensitivity training" for students and staff. J.R. 104. However, in his deposition, Adams could not recall taking any action relating to Robinson in response to the Letter of Determination, and EEO Advisor Amana Simmons testified in her deposition that Friendly staff did not receive any additional diversity or sensitivity training during the 2015-16 school year.

Eller's complaints were also sometimes followed by adverse actions against her. During the 2013-2014 school year, after Eller had filed multiple complaints with school administrators, Adams relocated Eller to a smaller classroom located further from administrative and security services. On June 3, 2015, Eller filed a formal charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), in which she alleged sex and gender identity discrimination and retaliation at Friendly. On June 11, 2015, Adams contacted Eller and removed her from teaching Advanced Placement ("AP") English courses. According to Adams, he took this action because Eller's students' test scores on the AP exam were low. Eller, however, has asserted that Assistant Principal Thompson later informed her that the removal was not about her teaching, and that the English Department Chair, Dr. Simmons, later told her that she had been removed because parents were complaining that her lifestyle was inappropriate. Then on two separate occasions, on August 20, 2015 and September 23, 2015, Adams made unsuccessful requests to Instructional Director Mark Fossett to "reduce" Eller's position to accommodate changes in student enrollment, which, if successful, would have resulted in Eller's involuntary transfer to another role or location within PGCPS. JSUF ¶¶ 60-63; J.R. 195.

On October 29, 2015, after Eller reported her October 26, 2015 exchange with Claggett about misgendering a student, Adams placed a "Letter of Counsel" in her permanent file stating that she had acted inappropriately by confronting a co-worker about pronoun usage for transgender students. J.R. 193, 421. In April 2016, during her last school year at Friendly, Eller was disciplined for raising her voice at students as she had a panic attack as a result of a classroom disruption and the aggressive behavior of a student in the class.

### C.     James Madison Middle School

After the 2015-2016 school year, Eller requested another transfer and was placed at James Madison Middle School.  In September 2016, within a month of her arrival, students began to misgender her.  These incidents escalated to threats of violence, as a student who had repeatedly misgendered Eller threatened to burn her house down, telling her that she was not really a person so it did not matter if he hurt her.  Eller alerted school leadership to the harassment by submitting at least one PS-74 form and by speaking directly with James Madison Principal Courtney King and Assistant Principal Ronald Connelin about the misgendering and the need for a student assembly on gender identity issues.  Although King and Connelin spoke with individual students following these incidents, King did not take any specific steps to address with students more broadly Eller's gender identity or the need for respect for transgender individuals.  When Eller spoke to Connelin about instances of misgendering, he told her to grow a "thicker skin" and to stop "proselytizing" to students.  J.R. 66.

On October 18, 2016, after she had been at James Madison for approximately two months, Eller took unpaid leave pursuant to the Family and Medical Leave Act ("FMLA") because of the sustained harassment.  During Eller's FMLA leave, which lasted until January 6, 2017, she was diagnosed with post-traumatic stress disorder ("PTSD").  She received outpatient psychiatric care at Georgetown University Hospital from November 2, 2016 through December 16, 2016. Following her FMLA leave, Eller began an approved unpaid leave of absence from January 9, 2017 to June 15, 2017.  In January 2017, Eller began working at a Target store as a part-time cashier, and in March 2017, she began work for the United States Department of Defense at Joint Base Anacostia-Bolling as a Program Assistant for the Child Youth Program on a limited basis, between 25 and 30 hours per week.  Eller resigned from her position as a PGCPS teacher on August

18, 2017.  She continues to take medication and attend dialectical behavioral and talk therapy to treat her PTSD.  To this day, the PGCPS non-discrimination policy fails to make specific mention of sexual orientation or gender identity.

### III.    Procedural History

As discussed above, on June 3, 2015, Eller filed a formal charge of discrimination with the EEOC ("the EEOC Charge") in which she alleged sex and gender identity discrimination based on the alleged harassment up to that date.  On April 29, 2016, she filed an Amended Charge with the EEOC alleging additional, ongoing verbal harassment based on sex and unlawful retaliation based on her removal from teaching AP courses and her receipt of the Letter of Counsel.  On August 31, 2018, she received a Notice of Right to Sue from the United States Department of Justice, Civil Rights Division, to which the EEOC had referred the matter.  Eller filed the present action on November 28, 2018 and filed an Amended Complaint on December 20, 2018.  In the Amended Complaint, based on the alleged harassment she suffered, Eller alleges the following nine causes of action in the following numbered counts:  pursuant to 42 U.S.C. § 1983, a claim against Defendant Goldson in her official capacity for a violation of the Equal Protection Clause of the Fourteenth Amendment (Count 1); sex discrimination based on a hostile work environment and constructive discharge, in violation of Title VII (Count 2), Title IX (Count 3), the MFEPA (Count 4), and the PGC Code (Count 5); and unlawful retaliation in violation of Title VII (Count 6), Title IX (Count 7), the MFEPA (Count 8), and the PGC Code (Count 9).

### DISCUSSION

In their Motion for Summary Judgment, Defendants assert that (1) PGCPS and Goldson are not proper defendants; (2) the retaliation claims are barred by a failure to exhaust administrative remedies; (3) the Title IX, MFEPA, and PGC Code claims are barred by the applicable statute of

limitations; (4) the factual record does not support Eller's claims of a hostile work environment, constructive discharge, and unlawful retaliation; and (5) Eller's claim for injunctive relief fails because she failed to designate an expert witness on the topic of anti-discrimination training. In her Cross Motion for Partial Summary Judgment, Eller argues that the undisputed facts establish that she is entitled to summary judgment on her hostile work environment and constructive discharge claims and on several affirmative defenses listed in Defendants' Answer.

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    PGCPS

Defendants argue that PGCPS is not a proper defendant in this case.  Pursuant to the Education Article of the Maryland Code, "[t]here is a county board of education for each county school system," Md. Code Ann., Educ. § 3–103 (West 2018), and a county board "[m]ay sue and be sued," *id.* § 3–104(b).  Under Maryland law, a "school district . . . does not exist as a separate entity for purposes of suit." *Adams v. Calvert Cnty. Pub. Schs.*, 201 F. Supp. 2d 516, 520 n.3 (D. Md. 2002).  Thus, courts have routinely held that in Maryland, it is the county board of education, not the school district, that is the proper defendant in a civil lawsuit.  *See id.* (finding that the Board Education of Calvert County, Maryland, not the Calvert County Public Schools, was the proper defendant in a federal anti-discrimination lawsuit); *James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 758 (D. Md. 2006) (finding that because the Frederick County Public Schools is not a legal entity, the plaintiff "should have named the Board" of Education as the defendant in a civil action).  Indeed, Eller does not oppose Defendants' Motion on this issue and consents to voluntary dismissal of PGCPS.  The Court therefore grants this part of Defendants' Motion and dismisses PGCPS as a defendant.

## III.    Defendant Goldson

Defendants argue that Eller's claim in Count 1 against PGCPS Chief Executive Officer Monica Goldson in her official capacity, a claim under 42 U.S.C. § 1983 that the harassment of Eller violated the Equal Protection Clause of the Fourteenth Amendment, should be dismissed because a government official sued in her official capacity is not a "person" capable of being sued under § 1983. Section 1983 provides a cause of action against a "person" who, under color of state law, "subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws"

11

of the United States. 42 U.S.C. § 1983. Lawsuits against state officials in their official capacities, however, are the equivalent of suits against the state itself. *See Will v. Mich. Dep't of Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself."); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) (stating that a judgment against a public servant "in his official capacity" imposes liability on the entity represented). A suit against the state is not a suit against a "person" as required for a § 1983 claim. *See Will*, 491 U.S. at 71.

Eller, however, argues that her § 1983 claim against Goldson is permitted because it seeks only declaratory and prospective injunctive relief. As an exception to the bar on § 1983 suits against a state, suits for "prospective injunctive relief against state officials acting in violation of federal law" are permitted pursuant to *Ex Parte Young*, 209 U.S. 123 (1908). *See Will*, 491 U.S. at 71 n.10. Under this limited exception, a federal court may issue prospective, injunctive relief against a state official to prevent ongoing violations of federal law, such as when the state officer is enforcing, or threatening to enforce, an allegedly unconstitutional state law. *See Ex Parte Young*, 209 U.S. at 155-60; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). The United States Supreme Court's holding in *Ex Parte Young* "was based on a determination that an unconstitutional state enactment is void and that any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such action is a nullity." *Papasan v. Allain*, 478 U.S. 265, 276 (1986). "In accordance with its original rationale, *Young* applies only where the underlying authorization upon which the named official acts is asserted to be illegal." *Id.* at 277. Accordingly, "[t]he *Ex Parte Young* exception is directed at 'officers of

the state [who] are clothed with some duty in regard to the enforcement of the laws of the state, *and* who threaten and are about to commence proceedings . . . to enforce against parties affected [by] an unconstitutional act." *McBurney*, 616 F.3d at 399 (quoting *Ex Parte Young*, 209 U.S. at 155-56).

Here, Eller's § 1983 claim against Goldson seeks declaratory and injunctive relief, including an order barring further discrimination "on the basis of sex, nonconformity with sex stereotypes, gender transition, and transgender status" and requiring that PGCPS implement "training for students, staff, and administrators at Prince George's County Public Schools regarding the nondiscriminatory treatment of transgender and gender nonconforming persons." Am. Compl. at 39, ECF No. 4. These claims for injunctive relief do not fall within the *Ex Parte Young* exception because Eller does not seek to enjoin the enforcement of an allegedly unconstitutional state law. Unlike the defendant state official in *Ex Parte Young*, there is no allegation or evidence that Goldson commenced, threatened to commence, or was about to commence any proceedings against Eller to enforce an allegedly unconstitutional provision of law. *See Ex Parte Young*, 209 U.S. at 131; *Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1415-16 (6th Cir. 1996) ("What we have here is not action, but inaction, and [*Ex Parte*] *Young* does not apply."). Count 1 of the Amended Complaint alleges that Goldson discriminated against Eller as a result of her inaction in response to the harassment of Eller but does not allege that she has engaged in any ongoing or imminent application of an unconstitutional law. There is no evidence in the record of such action. Under these circumstances, Eller's § 1983 claim does not fall within the *Ex Parte Young* exception. *See McBurney*, 616 F.3d at 399. Accordingly, although Eller may seek injunctive relief where permitted by her statutory claims, Defendants'

13

Motion for Summary Judgment will be granted as to the § 1983 claim against Goldson in her official capacity.

## IV.   Exhaustion of Administrative Remedies

Defendants argue that they are entitled to summary judgment on Count 6, Eller's Title VII retaliation claim, because she failed to reference her retaliation claim in an EEOC charge of discrimination filed within 300 days of the alleged unlawful employment practice. Before filing suit under Title VII, a plaintiff is required to file an administrative charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(f)(1). The "EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). The EEOC charge must contain allegations "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (quoting 29 C.F.R. § 1601.12(b) (2004)). If the claims asserted in a civil action "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Id.* at 509.

Here, however, the alleged unlawful employment practice not referenced in an EEOC charge is Eller's claim of retaliation following her filing of her EEOC Charge on June 3, 2015. *See* Am. Compl. ¶ 199. A plaintiff raising a claim of retaliation for filing a previous EEOC charge need not exhaust administrative remedies on that claim but instead may raise it for the first time in federal court. *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). The rationale behind this rule stems from two principles: first, the general rule that a Title VII lawsuit may extend to "any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission" and, second, that it is impractical and potentially chilling to expect victims of employment discrimination to file a new

14

EEOC charge for retaliation if they have already been retaliated against for filing the first EEOC charge. *Id.*

Further, the Court notes that Eller's Amended Charge, filed on April 29, 2016, specifically asserted a retaliation claim and referenced at least one later incident of alleged retaliation that occurred within the 300 days before that filing, the Letter of Counsel issued on October 29, 2015. Other alleged acts of retaliation, such as Adams's requests to "reduce" Eller's position via emails to Fossett sent on August 20, 2015 and September 23, 2015, also occurred in this time frame. JSUF ¶¶ 60-63. Because Eller's Title VII retaliation claim is based in part on the protected activity of filing her EEOC Charge, and because Eller has alleged retaliatory conduct occurring within 300 days of the filing of her Amended Charge, the Motion will be denied as to this issue.

## V.    Statute of Limitations

Defendants also argue that the claims in Counts 3-5 and 7-9 under Title IX, the MFEPA, and the PGC Code are barred by the applicable statutes of limitations. It is undisputed that at the time of the filing of this case in 2018, the limitations period for the claims under the MFEPA and the PGC Code was two years. *See* Md. Code Ann., State Gov't § 20-1013(a)(3) (West 2018) (providing that a civil action alleging "an unlawful employment practice" be filed "within 2 years after the alleged unlawful employment practice occurred"); *id.* § 20-1013(a)(3)(ii) (West 2021) (extending to three years the limitations period for harassment claims accruing after October 1, 2019); *id.* § 20-1202(c)(1) (allowing for discrimination claims based on county codes "within two years after the occurrence of the alleged discriminatory act"). Title IX, which provides that "no person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance," does not contain an express statute of limitations. 20 U.S.C. § 1681(a). In such an instance, courts "apply the most closely

15

analogous statute of limitations under state law." *Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989). Under Maryland law, the MFEPA, which provides a private cause of action against state entities for sex-based employment discrimination and retaliation, is the most analogous state law to Title IX for present purposes. *See* Md. Code Ann., State Gov't §§ 20-601, 20-606. In order to be timely, therefore, Eller's causes of action under Title IX, the MFEPA, and the PGC Code must have accrued within two years of November 28, 2018, the date of the filing of the original Complaint.

At the outset, the Court concludes that Eller's constructive discharge claims pursuant to Title IX, the MFEPA, and the PGC Code are timely. The limitations period for a claim of constructive discharge begins to run "only after a plaintiff resigns," which in this case occurred on August 18, 2017, less than two years before the filing of the original Complaint. *See Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016) (holding that "only at that point—and not before—does [a plaintiff] have a complete and present cause of action" for constructive discharge). Defendants argue that Eller did not assert a separate constructive discharge claim but instead asserted a combined "hostile-environment constructive discharge claim." *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019). Although Eller did not include in the Amended Complaint separate counts for constructive discharge claims, Eller has clarified that she intended these claims to be separate causes of action within the same count, which is permissible if the claims are based on the same "transaction or occurrence," as these claims are because they all arise from the same alleged pervasive harassment at PGCPS schools. *See* Fed. R. Civ. P. 10(b). Although not a model of clarity, Counts 3-5—the Title IX, MFEPA, and PCG Code counts labeled as "Hostile Work Environment" claims—all include allegations that Eller was subjected to a constructive discharge, Am. Compl. ¶¶ 163, 177, 192, and Eller elsewhere states specifically that she seeks redress for the

hostile work environment "as well as for Defendants' constructive termination of her employment," *id.* ¶ 10. Viewing the allegations in the light most favorable to the plaintiff, the Court construes the Complaint as including separate constructive discharge claims under each statute which are not time-barred.

As for the other Title IX, MFEPA, and PGC Code claims, by Eller's own admission, the last discriminatory act she faced contributing to her claims of a hostile work environment and retaliation occurred no later than "on or around November 9, 2016," several weeks before November 28, 2016. Pl.'s Mot. Summ. J. at 22 n.10, ECF No. 98-1. Eller nevertheless argues that the Title IX, MFEPA, and PGC Code hostile work environment and retaliation claims should not be barred because the limitations period should be equitably tolled for at least the period during which she was receiving outpatient psychiatric care, from November 2, 2016 through December 16, 2016. Equitable tolling of a limitations period is available only in "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019). To be eligible for equitable tolling, Eller must show "(1) that [s]he has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in h[er] way and prevented timely filing." *Id.* at 548 (quoting *Menominee Indian Tribe v. United States*, 136 S.Ct. 750, 755 (2016)). The doctrine is to be used infrequently, so that "individualized hardship" and "subjective notions of fair accommodation" do not "supplant the rules of clearly drafted statutes." *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000).

Eller ties her argument for equitable tolling to her time in outpatient care at Georgetown University Hospital from November 2, 2016 through December 16, 2016, during which "she was diagnosed with PTSD, depression, and anxiety from the abuse, discrimination, and retaliation she

17

experienced as an employee of Defendants." Pl.'s Mot. Summ. J. at 24. Eller argues that the "repeated nightmares, fatigue, lack of sleep, nausea, dizziness, swelling of her feet and legs, and dehydration" she suffered during this time period, along with her "severe psychological disconnection" and mental absence, rendered her unable to "pursue, let alone actively engage in, the prosecution of her claims during that time." *Id.*

Upon consideration of Eller's circumstances, the Court concludes that the facts alleged do not justify equitable tolling. Eller equates her condition at the time of her experience in outpatient care to "mental incapacity." Pl.'s Reply at 18, ECF No. 103. However, as the United States Court of Appeals for the Fourth Circuit noted in denying an equitable tolling argument based on a party's "schizoaffective disorder and generalized anxiety disorder," federal courts apply equitable tolling because of a party's mental condition only in cases of profound mental incapacity. *United States v. Sosa*, 364 F.3d 507, 513 (4th Cir. 2004) (quoting *Grant v. McDonnell Douglas Corp.*, 163 F.3d 1136, 1138 (9th Cir.1998)). Eller has failed to demonstrate that her mental condition rose to this level and has not identified legal authority supporting her claim that equitable tolling is appropriate when a party was undergoing only outpatient treatment for conditions comparable to her own.

Even if Eller truly were incapable of pursuing her claims for the six-week period from November 2, 2016 through December 16, 2016, this period of outpatient treatment concluded almost 23 months before the deadline to file her claims elapsed on November 9, 2018, leaving ample time to file her claim within the limitations period. Having acknowledged that she was represented by counsel both prior to and following her outpatient care, Eller has offered no persuasive explanation for the failure to file her claim within that period. The Court therefore concludes that equitable tolling is not justified in this instance. The Motion will be granted as to the hostile work environment and retaliation claims in Counts 3-5 and 7-9 under Title IX, the

MFEPA, and the PGC Code. However, the Title VII hostile work environment and retaliation claims, in Counts 2 and 6, remain.

## VI.    Hostile Work Environment and Constructive Discharge

Defendants further argue that the record evidence is insufficient to support Eller's claims of a hostile work environment and a constructive discharge. For her part, Eller argues in her Cross Motion for Partial Summary Judgment that she is entitled to summary judgment on her hostile work environment and constructive discharge claims.

### A.    Hostile Work Environment

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the plaintiff's race, color, religion, national origin, age, or sex; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006).

Here, there is no dispute that Eller experienced "unwelcome conduct" sufficient to establish the first element of a hostile work environment. *See Strothers v. City of Laurel*, 895 F.3d 317, 328-29 (4th Cir. 2018) (stating that this prong "is not a high hurdle" and can be established by an employee's voicing of an objection "to the alleged harasser or to the employer"). The Court addresses the remaining three elements.

### 1.    Based on Sex

Defendants do not appear to contest that the harassment of Eller was "because of . . . sex." 42 U.S.C. § 2000e-2(a).  In 2020, the Supreme Court held that for purposes of Title VII, discrimination based on an individual's transgender status constitutes discrimination "based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741, 1754 (2020).  As the Court stated, "it is impossible to discriminate against a person for being . . .  transgender without discriminating against that individual based on sex." *Id.* at 1741.  Likewise, the Fourth Circuit has held that sexual harassment in violation of Title VII may be based on one of several forms of sex-based motivations, including "a plaintiff's failure to conform to sex stereotypes." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 120 (4th Cir. 2021).  Where Eller has presented evidence that students, parents, and co-workers engaged in harassment that was explicitly sexual in nature or targeted Eller's transgender status—including calling Eller sexually degrading epithets like "tranny," "shemale," and "booty warrior," JSUF ¶ 20; J.R. 407, 429, continuously misgendering her, and threatening to rape her, the Court finds that there is sufficient evidence to establish that the harassment of Eller was based on sex.

### 2.    Severe or Pervasive

Defendants' primary argument is based on the third prong—that the record evidence does not support a finding that the harassment was sufficiently "severe or pervasive as to alter the conditions of [her] employment and create an abusive or hostile atmosphere." *EEOC v. Cent. Wholesalers, Inc.,* 573 F.3d 167, 175 (4th Cir. 2009).  This element has both subjective and objective components. *Id.*  As to the subjective component, the plaintiff must have subjectively perceived the environment to be hostile or abusive. *Id.*  Where Eller repeatedly alerted PGCPS administrators to the harassment and how it was affecting her work, and she underwent outpatient

treatment for PTSD as a result of the harassment, she has satisfied this requirement. *See id.* at 176 (finding that a plaintiff's emotional distress and complaints to supervisors met the subjective component); *see also* Defs.' Mot. Summ J. at 17, ECF No. 97-1 (conceding that "Plaintiff undoubtedly believes that the alleged incidents she endured [were] severe or pervasive").

In assessing whether the environment "was objectively severe or pervasive," courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cent. Wholesalers, Inc.*, 573 F.3d at 176 (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)); *see also Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010). No "single factor is dispositive" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Cent. Wholesalers, Inc.*, 573 F.3d at 176 (internal citations omitted).

Here, a reasonable jury could find that the harassment was objectively severe or pervasive. In the time period from Eller's transition in 2011 until her medical leave of absence in 2016, Eller was harassed continually by co-workers, students, and parents at three different schools. She was repeatedly misgendered, including being deliberately referred to as "he," "it," "sir," "mister," "guy in a dress," and her former name. J.R. 83-84, 404-406, 439, 456, 459. She was also called, both behind her back and to her face, a wide range of derogatory terms referring to her transgender status or based on a sex stereotype that as a transgender person, she was the equivalent of homosexual, including "tranny," "fag," "gay," "homo," "tranny," and "booty warrior," a term associated with pedophiles or child molesters. JSUF ¶ 20. At other times, a parent directly referred to her as a pedophile, and students implied that her transgender status made her a prostitute, calling

her "Ho" and asking "how much do you charge?" JSUF ¶ 48; J.R. 403. She was subjected to crude statements about her surgical status, such as "do you have a dick" and "have you cut it off." J.R. 402-03; J.R. 432. As the Fourth Circuit has recognized in finding harassment sufficiently severe and pervasive to constitute a hostile work environment, "[n]ames can hurt as much as sticks and stones." *EEOC v. Sunbelt Rentals*, 521 F.3d 306, 318 (4th Cir. 2008); *see also Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (finding that a reasonable person could "easily" find an atmosphere hostile where the plaintiff's supervisor called him discriminatory names "almost daily" and engaged in other facially neutral harassing behavior, including "intentionally [trying] to embarrass him"); *Boyer-Liberto*, 786 F.3d at 280-81 (holding that the use of a severe racial slurs on two occasions could be sufficient to establish a severe or pervasive hostile work environment).

Notably, the evidence also shows that the harassment included threats of physical violence, including a threat of rape at Friendly during the 2012-2013 school year, a veiled threat during the 2013-2014 school year that Eller needed to "watch herself," J.R. 403, and a September 2016 threat at James Madison that Eller's house would be burned down because she was "not really a person," J.R. 67-68, 417. Eller was even subjected to multiple physical assaults, including one incident when he was shoved out of a door, and two incidents—one during the 2013-2014 school year and one in November 2015—when students who had used slurs about her transgender status stepped and pressed down hard on her foot, the latter of which caused her to cry out in pain.

The record also supports the conclusion that the harassment altered the conditions of employment and created an abusive atmosphere. On two occasions, the harassment was so relentless that Eller and the school administrators agreed that she should be transferred to another school, thus illustrating a recognition that she could no longer work effectively at her present

22

school. When the harassment continued at the third school, Eller took a medical leave of absence. According to Eller's expert witness, Dr. Randi Ettner, a clinical and forensic psychologist at the Center for Gender Confirmation Surgery at Weiss Memorial Hospital in Chicago, Illinois, "the harassment, verbal, and physical abuse [Eller] sustained during her employment for several years, resulted in . . . complex post-traumatic stress disorder" that is "chronic." J.R. 869. She received outpatient treatment at Georgetown University Hospital for this PTSD. Even Defendants' expert witness, Dr. Marcellus Cephas, the Chief Executive Officer of Behavioral Healthcare of Maryland, testified that "[i]f what she is saying happened happened, we can see why she would have emotional distress." J.R. 515. Taken together, the frequency of the harassment over many years, the repeated threats of bodily harm, and the physical assaults provide sufficient basis to support a conclusion that the harassment was objectively severe or pervasive.

### 3.    Basis for Imposing Liability

The final prong of a hostile work environment claim is that there is a basis for imposing liability on the employer. Under Title VII, liability may be imputed to an employer in several circumstances. First, if the harasser is a supervisor, the employer is strictly liable if the supervisor's actions culminated in a tangible employment action. *Strothers v. City of Laurel*, 895 F.3d 317, 333 & n.6 (4th Cir. 2018) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 429-30 (2013)). A supervisor is someone empowered to "effect a significant change in employment status," such as firing, failing to promote, or "a decision causing a significant change in benefits." *Id.* Second, if the harasser is the victim's co-worker, the employer may be held liable if it "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc). Third, "[s]imilar to the reasoning [] set forth for employer liability for co-worker harassment," an employer can be held

liable for harassment of an employee by non-employee third parties when "the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 416, 422-23 (4th Cir. 2014) (applying this standard to harassment of a tile company employee by an independent sales representative for another company that did business with the tile company). This "negligence standard" applies to third-party harassment because an employer may not avoid Title VII liability for third-party harassment by "adopting a 'see no evil, hear no evil' strategy." *Id.* (quoting *Ocheltree*, 335 F.3d at 334).

Although there is evidence that some of the harassment against Eller was by supervisors, such as Assistant Principal Robinson, the vast majority of the harassment was by co-workers or third parties—students and parents. Nevertheless, the evidence is sufficient for a reasonable jury to conclude that the school administration knew of the harassment and failed to take prompt remedial action reasonably calculated to end it. Defendants do not contest that they knew about the harassment Eller faced at PGCPS schools. The record sufficiently demonstrates that, from the time of her transition in 2011 until her medical leave of absence in October 2016, Eller repeatedly sent emails to her school principals and filed formal and informal complaints about the verbal and physical harassment she experienced. Likewise, Defendants do not dispute the evidence that Eller repeatedly requested remedial steps such as discipline of the harassers and diversity training to mitigate and prevent harassment.

Defendants argue that they cannot be held liable for the harassment by staff, students, and parents because they "handled each and every situation appropriately." Defs.' Reply at 12, ECF No. 102. The record, however, contains substantial evidence to refute this claim. When Eller first disclosed the fact of her transitioning to Kenmoor Principal Fadli in 2011, she asked Fadli to keep

the information private until she was ready to discuss with others, but Fadli then announced it to teachers on Eller's grade-level team at Kenmoor without her consent. As early as May 4, 2011, Eller specifically complained to Fadli about co-worker harassment and informed her that she had overheard PGCPS staff in the Kenmoor teacher's lounge saying ". . . thinks he's a girl. . . . I know. It's disgusting." JSUF ¶ 18. This and other complaints about harassment by co-workers resulted in little to no discipline or remedial measures. Rather than addressing the harassment, administrators at Kenmoor instead focused on hiding Eller's gender identity by restricting her clothing, footwear, make-up, and nail polish choices to options conveying "androgynous qualities." J.R. 400. In fact, the Kenmoor human resources representative assigned to assist Eller through her transition demanded that she present as male and told her that a note from her therapist regarding her transition was "garbage." J.R. 399. The harassment continued despite Eller's complaints, leading to her transfer to Friendly for the 2012-2013 school year.

At Friendly, Eller's numerous complaints about the harassment did not result in effective remedial action. When Eller complained that Assistant Principal Robinson had publicly misgendered her in February 2015, and a Letter of Determination was issued on June 25, 2015 recommending counseling or discipline for Robinson and diversity and sensitivity training for students and staff, no corrective action was taken. The only diversity training session, conducted by Major Burks in March 2015, was ended early by Adams when a teacher complained about it. When Eller sought to correct a misgendering by Claggett, it was Eller, not Claggett, who received a Letter of Counsel.

After her transfer to James Madison in August 2017, when Eller attempted to speak to Assistant Principal Connelin, about misgendering, he just told her to grow a "thicker skin" and to stop "proselytizing" to students. J.R. 66.

25

As to student harassment, Defendants note that Robin Pope-Brown, an Assistant Principal at Friendly, testified in her deposition that incidents of student harassment of Eller were "anomalies" and were addressed "every single time" they were reported to her or other school administrators. J.R. 252. To the contrary, however, when asked in their depositions about several specific instances of student harassment, Pope-Brown and Friendly Assistant Principal Kevin Thompson separately could not recall any specific discipline being imposed. Moreover, while Eller filed multiple PS-74 forms complaining of harassment by students that were required to be maintained in the relevant students' files, Defendants failed to do so and have now lost the PS-74 forms submitted at Friendly. Notably, United States Magistrate Judge Timothy J. Sullivan, in addressing a spoliation claim, has recommended that the Court give a jury instruction stating that Defendants lost the PS-74 forms and that Defendants should be precluded from "arguing the lost or destroyed PS-74 forms corroborated" their accounts of the type of discipline allegedly imposed on harassing students. Order at 1, ECF No. 84.

As for harassment by parents, despite Eller's complaints, no action was taken when a parent referred to her as a "tranny" during the 2012-2013 school year, J.R. 402, or in response to a parent referring to her as a "pedophile" in Friendly's main office during the 2014-2015 year, J.R. 85. Friendly Principal Adams has acknowledged that although he had the authority to ban a parent from the school, he took no action in response to parental harassment of Eller.

In the end, beyond this evidence, the fact that harassment of Eller continued unabated despite her complaints for multiple years across three different schools illustrates that the record supports the conclusion that Defendants had not taken measures "reasonably calculated to end the harassment." *Cent. Wholesalers, Inc.*, 573 F.3d at 178 (finding that where a company's responses to the plaintiff's complaints of co-worker harassment based on race and sex "consistently failed to

end the harassment," a reasonable jury could conclude that the company failed to "take additional action . . . reasonably calculated to end the harassment").   Where the evidence is sufficient to establish all prongs of a hostile work environment claim, Defendants' Motion will be denied as to that claim.

### B.   Constructive Discharge

As discussed above, the Court construes the Amended Complaint to include claims of constructive discharge under Title VII, Title IX, the MFEPA, and the PGC Code. *See supra* part V.  Defendants also seek dismissal of these claims on the grounds that the record evidence does not support a finding that Eller's resignation amounted to a constructive discharge.

A constructive discharge claim is a claim distinct from the underlying discriminatory act, such as a hostile work environment. *Green*, 136 S. Ct. at 1779.  To prove a constructive discharge, a "plaintiff must show 'something more' than the showing required for a hostile work environment claim." *Evans*, 936 F.3d at 193 (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)). The plaintiff must "show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004).  Intolerability is "assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign . . . that is, whether [the employee] would have no choice but to resign." *Evans*, 936 F.3d at 193 (internal citation omitted).  The "frequency of the conditions at issue is important" as "[t]he more continuous the conduct, the more likely it will establish the required intolerability." *Id.*

Even under this higher standard, the Court finds that the evidence is sufficient to support a finding of a constructive discharge.  Viewed in the light most favorable to Eller, the evidence establishes that PGCPS students and parents repeatedly called her derogatory slurs such as "fag,"

"gay," "homo," "tranny," and "booty warrior," JSUF ¶ 20, and she was subjected to threats of physical violence tied directly to her identity as a transgender woman, including rape and arson, on multiple occasions. Eller was physically assaulted when she was routinely grabbed in hallways, a student shoved her, and two students intentionally stepped down hard on her foot while using a slur about her transgender status. As discussed above, the limited responses to Eller's complaints did not successfully end the harassment, which continued for over five years across three different schools, from the time she began transitioning while at Kenmoor in early 2011 to her departure from James Madison in October 2016. *See supra* part VI.A.2. Eller then took medical leave, was diagnosed with PTSD, and received outpatient treatment for more than six weeks, from November 2, 2016 through December 16, 2016. Although she did not resign immediately, she has asserted that the continuing harassment was so relentless and inescapable as to be intolerable, and she has provided an expert opinion that ultimately, "[t]he ceaseless harassment, discrimination and humiliation she was subjected to completely eroded her coping strategies and resilience, and resulted in the irremediable damage of what has now become chronic PTSD." J.R. 558. Viewing the evidence in the light most favorable to Eller, the Court finds that there is, at a minimum, a genuine issue of material fact as to whether Eller's working conditions were so intolerable that a reasonable person would have felt compelled to resign. *See Amirmokri*, 60 F.3d at 1132 (holding that a reasonable trier of fact could find a constructive discharge where the plaintiff was subjected to near-daily epithets and attempts to embarrass him in public). Defendants' Motion will therefore be denied as to the constructive discharge claim.

### C.     Eller's Cross Motion for Partial Summary Judgment

Although the Court will deny Defendants' Motion for Summary Judgment as to the hostile work environment and constructive discharge claims, it will not grant Eller's Motion for Partial

Summary Judgment on the same issues. As to hostile work environment, the question of whether the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive or hostile atmosphere is inherently fact-based and requires an assessment of the credibility of the witnesses. Moreover, the record provides some evidence upon which a reasonable jury could conclude that Defendants took some affirmative steps to respond to the harassment. For example, in October 2013, Adams reported to Eller that a student at Friendly was suspended for a number of offenses, including harassment of Eller. According to Pope-Brown, PGCPS supported Eller by providing her with resources to start "Caring Colors," a club at Friendly focused on supporting LGBTQ students and sought to explain gender identity issues to other students. J.R. 227-28. The March 2015 diversity and sensitivity training session on LGBTQ issues at Friendly, though cut short, was apparently held in response to Eller's request for such training. The issue of whether Defendants took sufficient remedial action to be deemed "reasonably calculated to end the harassment" is also an inherently fact-based inquiry most properly resolved by a jury.

Where the standard to establish a constructive discharge resulting from a hostile work environment is more stringent than the standard to establish a hostile work environment alone, the Court will necessarily deny the Cross Motion on the constructive discharge claim as well. *See Suders*, 542 U.S. at 149 (noting that a hostile work environment claim is a "lesser included component" of a constructive discharge claim based on a hostile work environment). Specifically, although Eller has presented evidence that the harassment impacted her mental health to the point that she felt compelled to resign, Defendants have noted that she did not resign for eight months after her outpatient treatment ended, and that she did not resign until after she had taken two other jobs. They thus argue that her resignation was the result of the choice of different employment

29

rather than the intolerability of the conditions at PGCPS.  Where there are genuine issues of material fact on the reasons for and necessity of Eller's resignation, the Cross Motion will be denied on both the hostile work environment and constructive discharge claims.

## VII.    Retaliation

In their Motion, Defendants also seek summary judgment on Eller's Title VII retaliation claim asserted in Count 6.  For her part, Eller argues that she has established all three elements of a *prima facie* case, and that at a minimum, there is a genuine dispute of material fact as to each element precluding summary judgment.  Under Title VII, it is unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3.  A Title VII retaliation claim may be established through direct evidence of retaliatory intent or through the following burden-shifting framework:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action.  If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted). To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events.  *Boyer-Liberto*, 786 F.3d at 281.

### A.    Protected Activity

"Protected activity" consists of "oppos[ing] any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e–3.  Such employment practices include those that

discriminate against employees with respect to their "terms, conditions, or privileges of employment" on the basis of race, color, religion, sex, or national origin. *See id.* § 2000e-2. Defendants do not dispute that Eller's EEOC Charge, filed on June 3, 2015, constituted protected activity. However, protected activity under Title VII is not limited to the filing of formal charges of discrimination. Courts take an "expansive view of what constitutes oppositional conduct." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). It "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). A plaintiff's actions are assessed in their totality, rather than as individual, discrete acts, to determine whether the plaintiff has opposed unlawful discrimination. *See DeMasters*, 796 F.3d at 418. Protected activity includes opposing employment practices that are either "actually unlawful under Title VII" or "reasonably believe[d]" by the employee to be unlawful. *Boyer-Liberto*, 786 F.3d at 282.

Here, Eller repeatedly voiced complaints to school administrators about discrimination and the harassment by co-workers, students, and parents and attempted to secure commitments from her supervisors for remedial measures to "prevent it or stop it when it is happening." J.R. 437. These complaints, among other examples, included a May 4, 2011 email to Kenmoor Principal Fadli complaining about derogatory comments made by teachers; an August 13, 2012 email to Friendly Principal Adams complaining of anti-transgender statements and slurs made by Friendly students; a November 12, 2014 email to Adams raising concerns about Assistant Principal Robinson potentially being assigned to supervise her because of Robinson's "biased and bigoted attitudes" relating to her transgender status, J.R. 614; a February 19, 2015 email and a February 20, 2015 formal Discrimination or Harassment Incident Report relating to the misgendering by

Robinson; and an October 7, 2015 email to Adams detailing complaints of harassment and micro-aggressions by staff and students.   There can be no dispute that Eller engaged in protected activity on multiple occasions.

### B.    Materially Adverse Actions

As to the second prong of Eller's retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Defendants' argument that Eller has failed to identify a materially adverse action relies on the outdated, more stringent standard for this element of an "adverse employment action" rejected by the Supreme Court in *Burlington Northern. See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 n.2 (4th Cir. 2007). Presently, an action taken against a plaintiff may be "materially adverse" even if it did not result in a loss of compensation, job title, level of responsibility, or opportunity for promotion. *See Burlington N.*, 548 U.S. at 67 (rejecting the standard limiting actionable retaliation to "so-called 'ultimate employment decisions'").

Eller alleges that Defendants took materially adverse actions when (1) during the 2013-14 school year, Adams reassigned Eller to a smaller and less desirable classroom located further from security cameras and administrative support; (2) on June 11, 2015, Adams removed Eller from teaching AP English courses; (3) on two occasions, in August and September 2015, Adams specifically attempted to "reduce" her position at Friendly High School, which would cause her to have to be transferred to another school, J.R. 836, 850; and (4) on October 29, 2015, Adams issued a Letter of Counsel to Eller after she had confronted Claggett about misgendering transgender students.   Eller further argues that these incidents must be analyzed with an eye toward their cumulative effect on her willingness to continue to report harassment.

Certainly, where Eller was the only teacher recommended for reduction, that attempted action could be viewed as materially adverse. Where Adams has stated that a Letter of Counsel is kept in a teacher's permanent file for future reference, it could constitute a material adverse action. *Cf. Belyakov v. Leavitt*, 308 F. App'x 720, 729 (4th Cir. 2009) (holding that issuing an official reprimand was a materially adverse action for purposes of a retaliation claim because it would dissuade a reasonable worker from making or supporting a charge of discrimination).

As for the other allegedly material adverse actions, "[c]ontext matters" in retaliation cases. *Burlington N.*, 548 U.S. at 69 (noting that a "change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children"). According to Eller, her AP classes were the home to her most respectful students, who "act[ed] as [her] advocate." J.R. 710. "Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges" would be to insist that she "spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Burlington N.*, 548 U.S. at 70-71. Thus, under the circumstances, a reasonable jury could conclude that the removal of Eller's AP classes from her duties "well might have dissuaded" her from continuing to file complaints of discrimination. *Id.* at 68. Likewise, particularly where the harassment of which Eller complained included threats and physical assaults, a transfer to an isolated classroom away from security cameras and administrative offices could dissuade an employee from speaking out about workplace harassment. *See Loya v. Sebelius*, 840 F. Supp. 2d 245, 252-53 (D.D.C. 2012) (holding that it was materially adverse to move the plaintiff's office to a different building in the same complex, where the move isolated her from her colleagues, made it difficult for her to complete her job duties, and cut off her access to administrative support services). Viewing the record evidence in the light most favorable to Eller as the nonmoving party,

33

the Court finds that Eller has presented sufficient evidence that she was subjected to one or more materially adverse actions.

### C.      Causation

As for the third prong of a *prima facie* case, Defendants argue that there can be no causal connection between Eller's protected activity and the materially adverse actions because Principal Adams has stated that he was not aware of her June 3, 2015 EEOC Charge, which was filed only days before Eller's June 11, 2015 removal from her AP classes, until 2019. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish [the causation element].")  However, Eller has asserted that she provided notice of her EEOC Charge to PGCPS when she served Notices of Claim with the County Attorney for Prince George's County and the Maryland State Treasurer on June 4, 2015.  Where the evidence on when Defendants became aware of the EEOC Charge is a disputed factual issue to be resolved at trial, Adams's testimony on this point does not provide a basis to grant summary judgment to Defendants.

More importantly, as discussed above, Eller's protected activity also included many repeated complaints to Adams and other supervisors from 2011 to 2016.  The alleged materially adverse actions all took place following one or more of these complaints.  For example, the removal from teaching AP classes and the effort to reduce Eller so that she would be removed from Friendly occurred from June to September 2015, only shortly after the June 3, 2015 EEOC Charge, but also less than four months after Eller had filed a formal Discrimination or Harassment Incident Report against Robinson for repeated misgendering on February 13, 2015 and during the

34

same time period as a June 22, 2015 complaint to Adams in which Eller requested a review of school security cameras and reported three students for harassment, one of whom had stopped in front of her classroom door and waggled her crotch while calling her a "Ho." J.R. 443. *See, e.g.*, *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (discussing cases finding causation when the materially adverse actions occurred four and six months after the protected activity). The October 29, 2015 Letter of Counsel was issued within three days of her October 26 discussion with Claggett about misgendering a student. The evidence is therefore sufficient to establish all elements of a *prima facie* case.

### D.    Non-Retaliatory Reason

Finally, Defendants assert that they are entitled to summary judgment because any materially adverse actions were taken for legitimate, non-retaliatory reasons, and Eller's disagreement with those reasons does not itself make the actions retaliatory. Specifically, Defendants allege that (1) Eller was removed from her AP classes due to the low scores of her students on the AP exam; (2) Adams's efforts to reduce Eller were the result of budgetary constraints and her lack of seniority; and (3) the Letter of Counsel was issued because Eller inappropriately addressed another teacher about misgendering a student when the issue did not relate to her.

Defendants, however, have failed to identify any legitimate, non-retaliatory reason for Eller's transfer to a smaller, less desirable classroom further from security and administrative resources. Further, Eller has provided countervailing evidence on the other materially adverse actions. As to Eller's removal from her AP courses, Eller stated in her Declaration that Assistant Principal Thompson informed her that "the removal was not about her teaching," and that the English Department Chair, Dr. Simmons, later told her that she had been removed because "parents

were complaining about [her] lifestyle being inappropriate." J.R. 420. This evidence contradicting Defendants' account creates a genuine issue of material fact on whether the stated reason for this action was a pretext for retaliation. Although Defendants argue that budgetary and seniority reasons justified Adams's request that Eller be reduced, the fact that other school administrators concluded that no reductions were actually necessary creates a genuine issue of material fact whether Adams's motivation for the recommendation was pretextual.

Finally, Eller testified at her deposition that when she spoke to Claggett about misgendering, she referenced PGCPS's policy that teachers should use the pronouns requested by the student, but Claggett then "became increasingly aggressive" and began to "shout at me about the trans agenda," yet Claggett received no Letter of Counsel or discipline for her conduct. J.R. 18, 194. Under these facts, where Claggett was the aggressor and was violating PGCPS policy, there is a genuine issue of material fact whether the Letter of Counsel to Eller was truly warranted by her conduct, or whether that stated reason was a pretext for retaliation.

At the summary judgment stage, a plaintiff need only present sufficient evidence for a reasonable jury to find that the proffered reasons were pretextual. *See, e.g., Okoli v. City of Baltimore*, 648 F.3d 216, 228 (4th Cir. 2011). In light of the conflicting evidence on the reasons for the materially adverse actions, "it should be for the jury to determine" whether the proffered non-retaliatory reasons "were the true motivation" for the decisions or were pretextual. *Id.* Because the record contains sufficient evidence for a reasonable jury to return a verdict for Eller on her retaliation claim, the Court will deny Defendants' Motion as to this claim.

## VIII.  Expert Witness

Defendants also seek summary judgment on Eller's claim for injunctive relief requiring non-discrimination training on the grounds that Eller failed to designate an expert witness on this

topic. Eller argues that because an order requiring non-discrimination training would be an equitable remedy as permitted under Title VII, this issue will not be a subject of trial and instead would be addressed post-trial.

Title VII gives federal courts broad authority to order injunctive relief when "the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice." 42 U.S.C. § 2000e–5(g). This authority extends to cases in which the intentional misconduct appears to have ceased. *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989) ("Under federal law, Title VII remedies have not been limited to correcting only ongoing discriminatory policies. District courts clearly have the authority and should exercise the power to grant injunctive relief even after apparent discontinuance of unlawful practices."). It also extends to relief that benefits persons other than the plaintiff. *Evans v. Harnett Cnty. Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982) ("An injunction warranted by a finding of unlawful discrimination is not prohibited merely because it confers benefits upon individuals who were not plaintiffs or members of a formally certified class."). Here, Eller alleges continuous harassment and discrimination over several years across multiple schools within the PGCPS system and notes that the BOE's non-discrimination policy presently fails to make specific mention of sexual orientation or gender identity. The record also reflects that several of Eller's supervisors at the time of her alleged harassment, including then-Assistant Principals Pope-Brown and Thompson, remain employed by the BOE in supervisory capacities as Principals of PGCPS schools. The Court thus cannot conclude at this point that injunctive relief is not warranted.

As to the availability of injunctive relief in the form of non-discrimination training, it is not clear than an expert witness is needed on this topic. Courts have repeatedly affirmed the importance of training to Title VII's remedial scheme and mandated training as a form of

injunctive relief. *See, e.g., E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 470 (5th Cir. 2013) (upholding a post-trial injunction which included mandated employee training, as specified in the district court order, *E.E.O.C. v. Boh Bros. Const. Co., LLC*, No. 09-6460, 2011 WL 3648483, at *3 (E.D. La. Aug. 18, 2011)); *E.E.O.C. v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 963 (E.D. Tenn. 2017) (mandating employee training as part of a post-trial injunction), *aff'd*, 899 F.3d 428 (6th Cir. 2018). Defendants have cited no authority for the proposition that expert testimony on this issue is a prerequisite to granting the requested relief. Even if such an expert proves to be needed, because an equitable remedy is imposed after trial, the Court does not find that the failure to designate such an expert at this point would prejudice Defendants so as to bar consideration of the argument. *Cf. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000) (reaffirming "the principle that front pay is an equitable remedy awarded at the discretion of the district court" and rejecting the argument that a "failure to submit evidence of or to argue front pay during the jury trial" waives such a claim); *Friendship Heights Associates v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir. 1986) (stating that a court "has broad discretion in determining whether to admit expert testimony"). Accordingly, Defendants' Motion will be denied as to Eller's failure to designate an expert witness on the topic of non-discrimination training.

## IX.   Affirmative Defenses

Finally, in Eller's Cross Motion for Partial Summary Judgment, Eller seeks summary judgment on several affirmative defenses asserted in Defendants' Answer. The defenses of exhaustion of administrative remedies and the statute of limitations were addressed above. *See supra* parts IV-V. In light of the Court's ruling denying summary judgment to either side on the issue of constructive discharge, the Cross Motion will be denied as to the defense of voluntary resignation. *See supra* part VI.B.

Eller further argues that she is entitled to summary judgment on the defense of Maryland's common law at-will employment doctrine, on the grounds that her constitutional and statutory claims all provide an exception to the state common law doctrine. *See Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 190 (Md. 1989) (acknowledging that Title VII and statutes like it serve as an exception to the at-will employment doctrine). Defendants do not contest this argument. Accordingly, the Court will grant Eller's Motion as to the affirmative defense of the at-will employment doctrine.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to (1) all claims against PGCPS and Goldson; and (2) the hostile work environment and retaliation claims in Counts 3-5 and 7-9 under Title IX, the MFEPA, and the PGC Code. The Motion will otherwise be denied. Plaintiff's Cross Motion for Partial Summary Judgment will be GRANTED IN PART and DENIED IN PART in that it will be granted as to the affirmative defenses of exhaustion of administrative remedies and the common law at-will employment doctrine, but it is otherwise denied. A separate Order shall issue.

Date: January 14, 2022

THEODORE D. CHUANG
United States District Judge

39